UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NATALIE  MOORE Individually, and as | ) | |
| Mother, Natural Guardian and Next Friend of | ) | |
| JAMARCUS BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:11-cv-01548-SEB-DML |
| HAMILTON SOUTHEASTERN SCHOOL | ) | |
| DISTRICT, | ) | |
| DR. BRIAN  SMITH, | ) | |
| TIGE  BUTTS, | ) | |
| BILLY  STACY, JR., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket

No. 65], filed on December 20, 2012 pursuant to Federal Rules of Civil Procedure 56.

Defendants seek summary judgment on all counts of Plaintiff Moore's complaint: (1) common-

law negligence under the Indiana Child Wrongful Death statute, (2) negligence per se for

violation of the federal Individuals with Disabilities Education Act (IDEA), (3) negligence per se

for violation of the federal Rehabilitation Act, (4) recovery under 42 U.S.C. § 1983 for violations

of the IDEA, the Rehabilitation Act, and the Due Process Clause of the U.S. Constitution, and

(5) violation of Title IX of the Education Amendments Act of 1972.[1] Plaintiff has abandoned

Count Five since filing her complaint; summary judgment is accordingly GRANTED on her

---

[1] Count Five was mislabeled as "Count VII" in the Complaint.

1

Title IX claim.[2] Regarding the other claims, for the reasons set forth below, the Motion for

Summary Judgment is GRANTED in part and DENIED in part.

### Factual Background

Plaintiff Natalie Moore is the mother of Jamarcus Bell ("Jamarcus"), a child who

tragically committed suicide on October 20, 2010.[3] Compl. ¶ 31.[4] During his sixth grade year,

Jamarcus enrolled at Fishers Junior High School (FJHS), a public school within the Hamilton

Southeastern School District (HSE). ¶ 10. The following year, Jamarcus began experiencing

disciplinary problems at school, and these problems continued throughout his years at FJHS; in

total, he was cited for 36 separate disciplinary infractions in less than two years. Butts Dep. Ex.

2. His misbehavior usually consisted of inappropriate physical contact with other students, such

as slapping, spitting, punching, kicking, or placing gum in another student's hair. *Id.* Tige Butts,

the Assistant Principal at FJHS, was the school official primarily in charge of disciplining

Jamarcus and communicating with his parents about disciplinary issues. ¶¶ 4, 12. On several

occasions, Jamarcus was punished for acts of retaliation he perpetrated against other students

who had provoked him, but his parents say they were nonetheless left with the impression that he

was the instigator. N. Moore Aff. ¶ 4, 5.

Jamarcus's problems with self-control worsened in seventh grade. He received 15

disciplinary referrals when in "unstructured settings" (i.e. outside of the classroom), leading

---

[2] Defendants devoted a significant portion of their briefing in support of this motion to countering the Title IX sex discrimination claim, which in Moore's complaint had been based on allegations that Jamarcus Bell suffered widespread bullying because of his perceived sexual orientation. Because Moore made no response to Defendants' arguments, and because Moore has presented no facts sufficient to support a reasonable inference of systematic sex discrimination on Defendants' parts, summary judgment is appropriate. *See Ienco v. Angarone*, 429 F.3d 680, 685 (7th Cir. 2005).

[3] Jamarcus's stepfather, Corey Moore, is not a named plaintiff in this case, though we are informed that he shared responsibility with Natalie Moore for Jamarcus's upbringing within their family. Jamarcus's biological father, Billy Stacy, Jr., was not involved in the facts of this case but was connected to Plaintiff as a nominal defendant. *See* Compl. ¶ 5.

[4] Unless otherwise noted, all citations to paragraph number refer to the complaint.

Butts to express concern about his overall ability to control himself. Butts Dep. 126; HSE Dep. Ex. 2, at 9. Butts described Jamarcus as a "likable kid" and a "pretty intelligent guy," but frustrating to an administrator because of the volatility of his behavior: "One minute he'd be your friend and giving you high fives, and the next he'd turn around and do something he shouldn't have been doing as soon as you're out of eyesight." He characterized this behavior as unusual, even within the smaller group of students with whom he regularly interacted for disciplinary reasons. Butts Dep. 104–105.

In an essay in the spring of his seventh grade year, Jamarcus related that he had "cut himself," run away from home, and attempted to overdose on pills; he explained that he did "not know what's wrong with [him]" and felt unable to control his impulsive behavior. HSE Dep. Ex. 2, at 72–72, 75. On April 21, 2009, Jamarcus made an apparent suicide attempt in a closet at school, leaving a note in which he expressed fear of punishment by his stepfather as his primary motive. N. Moore Dep. Ex. 2. After the suicide attempt, Jamarcus's mother admitted him to the hospital for nine days where he underwent intensive psychiatric treatment. *Id.* at 66. When he returned to school from the hospital, Jamarcus received no additional attention or supervision from school officials. *Id.*

In the spring of 2009, Jamarcus became a patient of psychiatrist Syed Khan, who treated him on a monthly basis until May 2010 and prescribed two medications to control his moods and depression. Khan Dep. 9; Defs.' Rep. 8. Jamarcus was additionally diagnosed with attention deficit hyperactivity disorder (ADHD), major depressive disorder, and oppositional defiant disorder. ¶ 16. In the fall semester of 2010 alone—his eighth-grade year—Jamarcus received 14 disciplinary referrals. HSE Dep. Ex. 16. Butts reached the conclusion that Jamarcus's behavior was intractable, and, after another disciplinary incident in December 2009, he recommended to

3

the administration that Jamarcus be expelled. Butts Dep. 212–214. Around the same time,

Jamarcus's mother had him evaluated by a neuropsychologist, Dr. Christopher Sullivan, who

concluded that Jamarcus's receiving adjustments to his learning environment was "critical" to his

well-being. Sullivan Dep. 44. Dr. Sullivan recommended that Jamarcus be evaluated for special

education services, and his mother in turn requested an evaluation from HSE. ¶ 18. She asserts

that this was the first time she had known of the possible availability of special education

intervention for Jamarcus. ¶ 19.

On February 2, 2010 HSE convened a Case Conference Committee (CCC) to evaluate

Jamarcus's eligibility for special education, staying his expulsion process until the CCC made its

decision. ¶ 22. Participants included teacher Amy Godbout, coordinator of special programs

Barbara Walters, school psychologist Callie Mathers, HSE special education director Thomas

Bell, Tige Butts, and Jamarcus's mother, Natalie Moore. Dr. Mathers reported the results of

evaluations including a cognitive ability test—in which Jamarcus scored at or above average in

all subject areas—an adaptive functioning evaluation, and a "functional behavioral assessment."

HSE Dep. Ex. 3, at 106, 222, 223. Dr. Mathers reported the overall scores of the adaptive

functioning evaluation to the CCC; more specific results not presented to the CCC gave

Jamarcus low scores for "school living," "health and safety," and "functional academics."

Mathers Dep. 17–18, 20–21. The "functional behavioral assessment" drew on input from

Jamarcus's teachers, at least some of whom rated him as "clinically significant" in the following

behaviors: hyperactivity, aggression, conduct problems, attention problems, and "atypicality."

HSE Dep. Ex. 3, at 222. He was also rated as "at risk" (a level of concern below "clinically

significant") for depression, attention problems, and study skills. *Id.* This kind of behavioral

evaluation ordinarily includes classroom observation, but such observation was not conducted in Jamarcus's case.

Dr. Mathers also conducted an interview with Jamarcus for use in the evaluation. In the interview, Jamarcus said in a sentence-completion exercise that, "I wish…I could stay out of trouble." Mathers Dep. 74. He also expressed frustration about feeling picked on by fellow students and teachers and feeling "infuriated" when provoked by other students. *Id.* Finally, Tige Butts made a presentation of Jamarcus's disciplinary history to the CCC, discussing Jamarcus's lengthy history of behavioral issues and his frustration at Jamarcus's lack of improvement. HSE Dep. Ex. 3, at 206.

The CCC concluded that Jamarcus demonstrated "inappropriate behaviors under normal circumstances," one of the five criteria sufficient to establish "emotional disability" status for a student—a finding that usually triggers a special education placement if the disability produces an adverse educational impact for a "long time." Bell Dep. 129; HSE Dep. Ex. 3, at 207. However, the CCC concluded that Jamarcus did not qualify for disability status, reasoning that his "C average" grades were evidence that he was "successful" in the normal environment and was not suffering an adverse educational impact from his behavioral problems. *Id.* Plaintiff received notice of the CCC proceedings and was present during the final evaluation; she and her husband both assert that, although they did not interpose objections on the record regarding the decision reached, they were ill-informed and confused about what special education services would entail. N. Moore Dep. 103–104; N. Moore Aff. ¶ 20. Although she signed a form informing her of the availability of the "procedural safeguards notice" detailing her rights to pursue an appeal or due process hearing if she disagreed with the CCC determination, Plaintiff

contends that she never received the actual notice, and that she was unaware of her procedural rights in the aftermath of the decision. HSE Dep Ex. 3, at 9; N. Moore Aff. ¶ 21.

After the CCC reached its decision denying him special education status, Jamarcus was expelled from FJHS. ¶ 26. Following his expulsion, Jamarcus attended Shelter Care, which provided a more structured learning environment. N. Moore Dep. 63. According to both his mother and Dr. Khan, he showed signs of improvement during this period. *Id.*; Khan Dep. Ex. 1. In the fall of 2010, Jamarcus enrolled as a freshman at Hamilton Southeastern High School, which, like FJHS, is a part of the HSE public district. Officials at Hamilton Southeastern were not made aware of Jamarcus's history of behavioral problems, including the suicide attempt. Simmons Dep. 137–138. During his brief time in high school, Jamarcus was involved in four disciplinary referrals to school administration; even more than at FJHS, however, it seems that Jamarcus was predominantly the victim of other students' actions. Simmons Dep. 125. Plaintiff recalls that Jamarcus had his clothes stolen, had his backpack dumped in the hallway, was physically harassed by other students and was subjected to epithets such as "flamer" and "faggot." ¶ 29, 30; N. Moore Dep. 41–44. Reggie Simmons, the dean of the high school, confirms that he dealt with incidents in which Jamarcus had his shoes stolen and was punched, Simmons Dep. 81–83, 87; he also expressed concern about another incident, in which a fellow student struck Jamarcus with a piece of metal in a welding class. Simmons Dep. 95–106; Keffaber Dep. 56–58. Plaintiff relates that she told Simmons after the punching incident that Jamarcus "had severe emotional issues, that he cannot afford to get in any trouble and that…I need him [Simmons] to let me know how he's going to assure these situations are going to be diffused." N. Moore Dep. 38. Jamarcus was transferred to a different welding class after the

altercation there, but the school took no other non-disciplinary action in responding to these incidents. Defs.' Br. 12.

Jamarcus committed suicide at his parents' home on October 20, 2010, during the school's fall break. ¶ 31. Earlier that week, Jamarcus had received a detention from a teacher, Mr. Wright, for disruptive talking during class. He left a suicide note, which is addressed to his parents and mentions the weight of their expectations on him and a recent inquiry from his stepfather about his sexual orientation. A large segment of the one-paragraph note also deals with school issues, and reads as follows:

> Skool [sic] is getting harder. I can get tests and class work done, yeah that's easy. Mr. Wright is a douche because I take all my notes and I answer any question he asks me. So he can take what he said and shove it. The talking in his class is only every once in a while, he just likes to give out detentions because he is a douche. It's really hard to tell you I am killing myself but stuff has just built up to [sic] much for me to handle.

Flynn Dep. Ex. B. Jamarcus's parents discovered the suicide shortly thereafter, and Detective Flynn of the Fishers Police Department conducted an investigation. On November 21, 2011, Plaintiff brought this suit against HSE, Tige Butts, and HSE superintendent Brian Smith.

## Legal Analysis

### Preliminary Evidentiary Issues

The parties have both devoted a significant portion of their reply and surreply briefs to disputes about the appropriateness and timeliness of each other's evidentiary designations and arguments. With one exception—Defendants' argument based on the deposition of Dr. Syed Khan—we do not find these objections to be well-founded.

### 1. Plaintiff's objection to Defendants' "new arguments" in reply

Plaintiff claims that the Defendants' reply brief contains a number of arguments asserted for the first time, violating the rule that all arguments made on summary judgment must be raised

in the opening brief as opposed to a reply brief. Pl.'s Surreply 2. Plaintiff cites the rule correctly, *see United States v. Berkowitz,* 927 F.2d 1376, 1391 (7th Cir. 1991) (citing Seventh Circuit Rule 28(f)); *Praigrod v. St Mary's Med. Ctr.,* 2007 WL 178627, at *3 (S.D. Ind. Jan. 19, 2007) (applying the appellate rule to district court briefing), but most of the arguments she complains of are not "new" to the reply brief.

According to Plaintiff, seven arguments against her IDEA and Rehabilitation Act claims materialized for the first time only after the initial brief in support of summary judgment. These are that: (1) the child find obligation[5] is irrelevant; (2) the CCC's decision not to classify was proper; (3) Plaintiff fails to identify case law that would suggest a different outcome had a § 504 plan been considered; (4) Jamarcus was able to control his behavior; (5) Plaintiff has not identified a school policy or custom in violation of the statutes; (6) there is no precedent for holding a school liable in this situation; and (7) Jamarcus did not have active suicidal ideation at the time he was evaluated for special education services. Pl.'s Surreply 4.

Two of these points are not "arguments" at all; pointing to the lack of case law supporting elements of Plaintiff's position is not a new substantive legal claim, but rather an argumentative tactic. With regard to the "child find" obligation, Plaintiff's language is misleading. Defendants do assert that the obligation is "irrelevant in this matter," but, as the context makes clear, the thrust of their argument was that they did not *violate* it. *See* Defs' Rep. 20. The remaining three points are all re-characterizations—elaborations on arguments that were already present in the initial brief, albeit in poorly-developed form. In their first submission, Defendants denied that the evaluation decision was improper, pointing to the fact that "even his own mental health professionals did not consider him a problem at that time." Defs.' Br. 27. They also pointed to

---

[5] For a more complete explanation of the "child find" obligation and other IDEA procedural requirements, see *infra* § I(B)(2).

the fact that his behavior—thus implicitly his self-control—was apparently improved by the time he enrolled in high school in fall 2010. *Id.* at 29–30. While inserting entirely new substantive issues in a reply brief is impermissible, changing emphasis on points already in contention is not. *See Cnty. Materials Corp. v. Allan Block Corp.,* 431 F. Supp. 2d 937, 946 (W.D. Wisc. 2006). It is true, as Plaintiff complains, that these assertions are all "miraculously" expanded from their original state; however, we do not see that as sufficient reason to exclude them from consideration when Plaintiff was already on notice these issues were in play.

### 2. The new contributory negligence argument from Khan deposition

Plaintiff also objects to the late introduction of testimony by Dr. Syed Khan, Jamarcus's psychiatrist, in support of Defendants' argument that Jamarcus's parents were contributorily negligent in removing him from his medications in 2010. Pl.'s Surreply 2; Defs.'s Rep. 8–9, 14. The issue of whether the Moores were negligent in terminating medications is raised for the first time by Khan's deposition, which went forward after the initial motion and brief. Because it thus qualifies as an untimely new argument, we will not consider it in ruling on this motion. *See Praigrod,* 2007 WL 178627, at *3.[6]

### 3. The Moore affidavits

For their part, Defendants object to the "self-serving," "attorney-drafted" affidavits submitted by Natalie and Corey Moore to supplement their initial deposition testimony. Defs.' Rep. 4, 5. Defendants argue these affidavits contradict early testimony on the issues of

---

[6] Plaintiff also argues that the Khan deposition in its entirety must be excluded because Defendants failed to properly identify their expert witness, in violation of Fed. R. Civ. Pro. 37(c)(1), and because they violated our own Case Management Plan by failing to serve an expert disclosure regarding the use of his testimony on Plaintiff no later than 60 days prior to the dispositive motion deadline. *See* Docket No. 36. We do not consider it necessary to rule on this additional argument, because we have already excluded from consideration Dr. Khan's testimony as it relates to the question of contributory negligence, and none of the remainder of his expert testimony is dispositive to the case's other factual issues.

Jamarcus's home behavioral problems and their alleged opposition to his being offered special education services. Defs.' Rep. 3–6.

The "sham affidavit" rule states that a party may not establish a genuine issue of material fact solely by filing an affidavit that contradicts prior sworn testimony. *Bank of Ill. v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1169 (7th Cir. 1996); *Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP*, 2006 WL 2644935, at *1 (S.D. Ind. Sept. 14, 2006). However, this rule will not apply when the later statement does not directly contradict the earlier sworn testimony, *see Paul Harris Stores,* 2006 WL 2644935, at *1–2 , or when it is based on newly discovered evidence or serves to "clarify ambiguous or confusing deposition testimony." *Adelman-Tremblay v. Jewel Cos., Inc.*, 859 F.2d 517, 520 (7th Cir. 1988).

As to her discussion of Jamarcus's behavior at home, Plaintiff correctly points out that her prior statement—which Defendants seek to contrast with the affidavit—was not sworn testimony. It was a handwritten statement made as part of the school's evaluation efforts, about which Plaintiff was asked at her sworn deposition, but did not give any clear or definitive answers. *See* N. Moore Dep. 79–80; *cf. Bank of Ill.*, 75 F.3d at 1169 (rule does not apply to prior statements not made under oath). On the more significant issue of the Moores' opposition to special education, the deposition testimony is insufficiently definite for us to find that the affidavits do directly contradict it. In her deposition, Plaintiff testified, "we both vocalized concerns about hey, this is probably not a great idea for [Ja]marcus, he already has problems, I don't want the stigma related to him that he's in special education, this is going to make things worse for him." N. Moore Dep. 101. We agree with Plaintiff that the affidavits—in which both Corey and Natalie Moore assert that the school had given them the impression that a disability classification would result in Jamarcus being followed by a special education teacher while

10

continuing to attend normal classes—serve to supplement or explain, rather than contradict, the

deposition. *See* Docket No. 83-2, ¶¶ 15–18; Pl.'s Surreply 13–14. To the extent the earlier

testimony was ambiguous as to the Moores' understanding of what special education entailed,

the affidavit may clarify; a jury could find either the deposition or the affidavits—or both—lack

credibility, but they are not so directly contradictory that the affidavit should be wholly excluded

from consideration.

### 4. The Jennifer Horn Affidavit and Report

Finally, Defendants take issue with the affidavit and expert report provided by Dr.

Jennifer Horn, who performed a post-mortem psychological evaluation of Jamarcus Bell based

on his records. Specifically, they argue that her opinion is comprehensively undermined by her

reliance on the notion that Jamarcus suffered from widespread bullying, and they object to her

conclusion that Jamarcus suffered from "active suicidal ideation" at the time he confessed to an

attempt to overdose on pills. Defs.' Rep. 11–13 (citing Docket No. 83-6). As Plaintiff points out,

Defendants cite no authority for the proposition that their disagreement with her conclusions—or

one of the factual assumptions on which they are based—disqualifies her affidavit wholesale. *See*

Pl.'s Surreply 16–17. Dr. Horn is qualified as an expert, *see* Horn Aff. ¶¶ 2–10, and on a motion

for summary judgment we need not contemplate excluding her opinions because Defendants

might successfully challenge their weight or credibility at trial.

### Standard of Review

Summary judgment is appropriate on a claim if the moving party can show that there is

no genuine dispute as to any material fact, leaving them entitled to judgment as a matter of law.

Fed. R. Civ. Pro. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986).  The purpose of

summary judgment is to "pierce the pleadings and to assess the proof in order to see whether

there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the Amere existence of some alleged factual dispute between the parties,@ *id.*, 477 U.S. at 247, nor the existence of Asome metaphysical doubt as to the material facts,@ *Matsushita*, 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Here, the Defendants as the moving party Abear the initial responsibility of informing the district court of the basis for [their] motion," and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Because Plaintiff, the non-moving party, will bear the burden of proof at trial, Defendants may discharge their burden at this stage of the proceedings by showing an absence of evidence to support Plaintiff's case. *Id.* at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in Plaintiff's favor, if genuine doubts remain and a reasonable fact-finder could find for Plaintiff, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992). But if it is clear that Plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *Ziliak v.*

12

*AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element Anecessarily renders all other facts immaterial.@ *Celotex*, 477 U.S. at 323.

## Discussion

Plaintiff's surviving claims may be divided into two broad groupings. Counts One, Two, and Three sound in negligence, seeking recovery under Indiana common law for violation of the general duty care and under negligence per se principles for violations of the IDEA and Rehabilitation Act, respectively. Count Four arises under federal law, seeking recovery under 42 U.S.C. § 1983 for Defendants' alleged violation of the same federal statutes and the Fourteenth Amendment's Due Process clause. We will address these two groups of claims in succession.

## I.  The Negligence Claims

Plaintiff claims that Defendant HSE was negligent in its conduct towards her son, violating the common-law duty of care and the standards of care established by two federal statutes, the IDEA and the Rehabilitation Act.[7] Because these state-law claims are before us pursuant to our pendent jurisdiction under 28 U.S.C. § 1367, we apply Indiana law. *See United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726 (1966). Although they rely on different predicate duties, all three claims must satisfy the elements in common of the tort of negligence under Indiana law.

In Indiana, the "tort of negligence is comprised of three elements: (1) a duty on the part of defendant in relation to the plaintiff, (2) failure on the part of defendant to conform his conduct to the requisite standard of care required by the relationship; and (3) an injury to the plaintiff resulting from that failure." *Norman v. Turkey Run Cmty. Sch. Corp.,* 411 N.E.2d 614, 616 (Ind. 1980) (citing *Neal v. Home Builders Inc.,* 111 N.E.2d 280, 284 (Ind. 1953)). We

---

[7] Moore initially asserted negligence claims on all three counts against Defendants Brian Smith and Tige Butts as well, but the claims as to the two individual defendants were dismissed. *See* Docket No. 60.

consider the issues of duty owed and breach with respect to each of the claims individually, before addressing the common issues of proximate causation and Defendants' affirmative defenses.

## A. Count One – Negligence under Common Law

Plaintiff seeks recovery for negligence under the Indiana Child Wrongful Death Act, which allows a surviving parent to recover damages from "the person whose wrongful act or omission caused the injury or death of a child." Ind. Code § 34-23-2-1(c). Damages under the Act may include loss of services, love and companionship, as well as funeral and counseling expenses. The elements of a wrongful death claim are functionally identical to those of common-law negligence, *see Hays v. Bardasian,* 615 F. Supp. 2d 796, 800 (N.D. Ind. 2009), except that wrongful child death actions, as statutory claims, are to be construed strictly. *Melvin v. Patterson,* 965 F. Supp. 1212, 1215 (S.D. Ind. 1997) (citing *Ed Wiersma Trucking Co. v. Pfaff,* 643 N.E.2d 909, 911 (Ind. Ct. App. 1994)).

Public schools in Indiana indisputably have a responsibility, albeit a basic one, towards their students. "With respect to negligence, a public elementary school has only one duty at common law—the duty to exercise ordinary and reasonable care." *LaPorte Cmty. Sch. Corp. v. Rosales,* 963 N.E.2d 520, 524 (Ind. 2012); *see also Miller v. Griesel,* 308 N.E.2d 701, 706 (Ind. 1974). Although this duty may be "ordinary," it is nonetheless sensitive to context. Most obviously, the degree of care required is amplified when its objects are children, "whose characteristics make it likely that they may do somewhat unreasonable things," and over whom the school exercises partial custodial care. *Griesel,* 308 N.E.2d at 706 (citing Restatement (Second) of Torts § 320 (1965)).  There is no bright-line rule confining a school's duty to events occurring on school grounds on during school hours, though the particular circumstances of a

14

student's injury will bear on the factual questions of breach and causation. *See Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.,* 756 N.E.2d 970, 974–975 (Ind. 2001) (holding that school's liability could extend to injury occurring off school property). The existence of a duty towards a plaintiff is a legal question, *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 484 (Ind. 2003), and here its resolution is simple. HSE, as a public school district, owed a duty of ordinary and reasonable care under the circumstances to Jamarcus.

While duty is a legal question, its breach is a highly fact-dependent one, and therefore "summary judgment is especially inappropriate where the critical question for resolution is whether the defendant exercised the requisite degree of care under the factual circumstances." *McClyde v. Archdiocese of Indianapolis,* 752 N.E.2d 229, 233 (Ind. Ct. App. 2001). Only where the facts are undisputed and lead to but a single inference or conclusion may the court as a matter of law determine whether a breach of duty has occurred. *King,* 790 N.E.2d at 484 (quoting *Stephenson v. Ledbetter,* 596 N.E.2d 1369, 1371–1372 (Ind. 1992)).

Schools are not "insurers" of their students, and there are thus some circumstances—even when student injury occurs in connection with school property or school conduct—under which schools will be held not to have breached their duty as a matter of law. *See Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 955 (S.D. Ind. 2007). Indiana courts have held, for instance, that school districts cannot be held responsible for ensuring that no collisions occur in a high school parking lot after dark, *see Ashcraft v. Ne. Sullivan Co. Sch. Corp.*, 706 N.E.2d 1101, 1105 (Ind. Ct. App. 1999), and that accidental injury of a child at recess cannot be attributed to a school's breach of duty, absent other evidence of inattention, *see Norman*, 411 N.E.2d at 618 ("Even perfect attention to this incident might not have prevented it. . . .  To hold the school personnel liable under the set of facts presented here would require them to be insurers of the

15

safety of children in their care and impose strict liability for their safety."). There are therefore factual claims whose nexus with any reasonable conception of school duty is so weak that they should not survive for jury consideration; this bar, however, is a low one to clear. Even an arguably self-serving affidavit by a plaintiff, if not stricken as inadmissible under evidentiary rules, furnishes a sufficient question of material fact to survive summary judgment on the issue of breach. *See McClyde,* 752 N.E.2d at 234–235 (denying summary judgment, and finding that an issue of fact was created by an affidavit about which the trial court was "justifiably skeptical").

The facts, when viewed in a light most favorable to Plaintiff, would be sufficient to support a jury inference that HSE failed to exercise proper care towards Jamarcus under the circumstances. Plaintiff's complaint alleges that the district failed to take "appropriate steps" to prevent his suicide, to protect him from bullying, and to arrange an alternative learning environment for him. Compl. ¶¶ 36, 38. Since it is the *safety* of students, not a more holistic measure of their well-being or educational fulfillment, that lies at the heart of the common-law tort duty owed by schools, *see, e.g. Dibortolo v. Metro. Sch. Dist. of Wash. Tp.*, 440 N.E.2d 506, 509 (Ind. Ct. App. 1982), the only facts appropriate for consideration are those tending to show HSE's negligence in the face of a danger to Jamarcus of which it was aware or should have been aware.

Plaintiff can point to the following facts that could well give rise to an inference that HSE breached this duty. The district admitted that it failed to establish written procedures for the identification of students needing special services, Bell Dep. 33–34; it also failed to provide special educational services for Jamarcus in the face of at least some evidence that such services were appropriate and necessary to his well-being, *see* Sullivan Dep. 24–25; HSE Dep. Ex. 3, at

214. These actions, coupled with the alleged violations of statutory duties to provide special education services (discussed below at § I(B)(2)), could support an inference that the lack of intervention in Jamarcus's course of schooling left him uniquely vulnerable to self-harm in light of his mental and emotional problems. At least one expert consulted by HSE thought that the district's course of action could exacerbate the risk of depression or suicide, and he communicated to HSE that adjustments to Jamarcus's educational status were "critical." Sullivan Dep. 44; HSE Dep. Ex. 3, 214.

More directly, the facts could support a conclusion that the district failed to exercise its protective duty properly given its awareness of Bell's propensity to self-harm.[8] Staff members at FJHS were aware of an essay written by Bell in which he admitted that he had stabbed himself and tried to overdose, and discussed his inability to control himself. HSE Dep. Ex. 2, at 75. After Bell made a suicide attempt at school in seventh grade, no additional actions were taken to ensure his well-being upon his return to school from the hospital. Butts Dep. 166–167. In the course of his evaluation for possible special services before his expulsion, Bell told the school psychologist, in an evaluation presented to the Case Conference Committee, that he had cut himself and tried to overdose. Mathers Dep. 53–54, HSE Dep. Ex. 3, at 218–219. School officials at FJHS allegedly failed to convey any information about Bell's vulnerability— including notice of his expulsion, multitudinous disciplinary problems, or suicide attempt—to Hamilton Southeastern High School when he enrolled there. Keffaber Dep. 48–49; Cutter Dep. 86–88, 91–93; Simmons Dep. 117, 137–138. Evidence also indicates that Jamarcus was the victim of at least some bullying at Hamilton Southeastern High School, Pl.'s Resp. 19–22; this bullying, coupled with the interview information in Jamarcus's special education file in which he

---

[8] The idea that student suicide may constitute a foreseeable harm within the school's duty of ordinary and reasonable care, to which Defendants take exception, is further discussed below in the context of causation. *See infra*, § I(C).

discusses how "someone talking down to me, or hitting me" can "infuriate" him and trigger his volatile behavior, Mathers Dep. 70, might have prompted reasonable school officials to take more affirmative measures.

Adolescents are more susceptible than other segments of the population to certain dangers, including substance abuse, auto accidents, and self-harm or suicide. A school district cannot be charged with an unlimited duty to guard against the possibility of student mental illness creating a danger of self-harm, just as it cannot be held responsible for ensuring that no car accidents take place in its parking lots. *See Ashcraft,* 706 N.E.2d at 1105. That calculus may well change, however, when the district has reason to know of an individual student's heightened vulnerability. In *Seiwert v. Spencer-Owen Community School Corp.*, 497 F. Supp. 2d 942 (S.D. Ind. 2007), this Court found a breach of the duty of care where school officials placed two students on a bus together when they had received warnings that one had threatened violence against the other. 497 F. Supp. at 955.[9] The facts here may be less extreme, but the risk of harm is not. We agree with the Eleventh Circuit that a school need not possess a "crystal ball" to understand that a student who has already attempted suicide once may do so again, and to know that meeting its duty to protect him might require additional attention to protective measures. *See Wyke v. Polk Cnty. Sch. Bd.,* 129 F.3d 560, 574 (11th Cir. 1997). Other factors—such as the lapse of time, Bell's apparent improvement in high school, and the fact that he was receiving outside psychiatric help—may well defeat the inference that the school breached its duty of care. But the question is a factual one, and we agree with Plaintiff that sufficient facts exist to survive summary judgment on this score.

---

[9] The allegation in *Seiwert* arose out of a third-party beneficiary contract claim, but the duty analyzed by the court was the same: "to use ordinary and reasonable care for the safety of their students." 497 F. Supp. 2d at 955 (citing *Miller,* 308 N.E.2d at 706).

**B. Count Two – Negligence Per Se for Violation of the IDEA**

In addition to her common-law claim, Plaintiff also seeks recovery under a theory of negligence per se, predicated on violations of two federal statutes, the Individuals with Disabilities Education Act (IDEA) and the Rehabilitation Act. Negligence per se under state tort law can be premised on the violation of a federal statute, with the statute providing the standard of conduct and state common law furnishing the other elements of the tort. *See Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 318–319 (2005); Restatement (Third) of Torts: Phys. & Emot. Harm § 14 (2010). Indiana courts apply negligence per se principles to unexcused violations of both state and federal statutes. *Erwin v. Roe,* 928 N.E.2d 609, 620 (Ind. Ct. App. 2010); *Ray v. Goldsmith,* 400 N.E.2d 176, 178 (Ind. Ct. App. 1980).

Violation of a statute alone does not suffice to constitute a breach of duty under negligence per se principles. In order to prevail, the plaintiff must also show the statute is applicable to his or her case—that it "was designed to protect the class of persons in which the plaintiff is included against the risk of the type of harm which has occurred as a result of its violation." *Dawson ex rel. Dawson v. Long,* 546 N.E.2d 1265, 1268 (Ind. Ct. App. 1989) (quoting *Ray,* 400 N.E.2d at 178). When these criteria have been met, courts accept the legislative judgment that a violation of the statute in question constitutes unreasonable conduct. *Cook v. Whitsell-Sherman,* 796 N.E.2d 271, 276 (Ind. 2003). In a previous order in this case, we made clear that we see no inherent legal bar to the application of negligence per se principles to the IDEA and the Rehabilitation Act. Docket No. 60 at 19 (denying Defendants' motion to dismiss).[10] We now apply those principles to the statutory scheme created by the IDEA.

---

[10] We found that "[b]ecause the Seventh Circuit is amenable to the notion that the IDEA creates an enforceable § 1983 claim," there was analogously no reason to block, as a matter of law, recovery for violation of the IDEA (or the Rehabilitation Act) under a state cause of action like negligence per se.

### 1. Applicability of the IDEA to the claim

The Individuals with Disabilities Education Act (IDEA), amended in 2004 as the Individuals with Disabilities Education Improvement Act (IDEIA), 20 U.S.C. § 1400 *et seq.*, is a landmark component of federal special education law.  Among Congress's stated objectives in passing the legislation were "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services" and "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(A)–(B). The statute defines a "child with a disability" as one "who needs special education and related services" because of a covered health impediment. 20 U.S.C. § 1401(3); 34 C.F.R. § 300.8(c).

The first questions we must answer, then, are whether Plaintiff is within the class the statute intended to protect and whether the statute's coverage extends to the risk of the type of harm which ultimately occurred. The statute's protected class consists of "children with a disability" and their parents. 20 U.S.C. § 1400(d)(1)(B). Federal regulations promulgated under the IDEA further define the criteria necessary for a child to qualify as possessing a disability under the statute; most relevantly, they include children with an "emotional disturbance." 34 C.F.R. § 300.8(a)(1). To suffer from an emotional disturbance, a child must exhibit at least one of the following characteristics: (1) "an inability to learn that cannot be explained by intellectual, sensory, or health factors," (2) "an inability to build or maintain satisfactory interpersonal relationships with peers and teachers," (3) "inappropriate types of behavior or feelings under normal circumstances," (4) "a general pervasive mood of unhappiness or depression," and (5) "a tendency to develop physical symptoms or fears associated with personal or school problems." 34 C.F.R. § 300(c)(4)(i). Regardless of whether the district's denial of special education services

was correct, it is undisputed that Jamarcus met at least one of the criteria for emotional

disturbance by exhibiting inappropriate behavior under normal circumstances. Bell Dep. 107.

The question of whether Jamarcus Bell and his mother are within the class protected by the

IDEA, then, merges with the factual dispute over Defendants' failure to classify him as disabled.

As such, it is appropriately reserved for the trier of fact. *See Dawson,* 546 N.E.2d at 1268.

We have already rejected Defendants' argument that the IDEA "is not intended to protect

against the sorts of harm that has [sic] occurred," Docket No. 60 at 19, and we see no reason to

depart from that conclusion. The Seventh Circuit, in *McCormick v. Waukegan School District

No. 60,* 374 F.3d 564 (7th Cir. 2004), affirmed that a claim for money damages may arise under

the IDEA; further, it held that the statute's exhaustion requirement is excused where the "theory

behind the grievance"—i.e. compensatory damages for a harm not amenable to redress by

prospective educational services—would render exhaustion futile. 374 F.3d at 569. Other courts

that faced more squarely the issue presented here have likewise found exhaustion to be futile

when parents of a deceased child seek damages for a district's failure to provide IDEA services

while the child was still living. *Taylor v. Altoona Area Sch. Dist.,* 737 F. Supp. 2d 474, 482

(W.D. Pa. 2010); *see also Susavage v. Bucks Cnty. Intermediate Unit No. 22*, 2002 WL 109615,

at *19 (E.D. Pa. Jan. 22, 2002). As we noted before, Jamarcus's death, "although highly unusual,

is precisely the type of harm that the IDEA and the Rehabilitation Act seek to avoid." Docket

No. 60 at 24. The IDEA thus applies to Plaintiff's claim.

### 2. Breach of Statutory Duty

As with the breach of a common-law duty of care, HSE must show that the facts do not

support a reasonable inference that the district violated the IDEA in order to obtain summary

judgment as to this issue.

The central requirement of the IDEA is that state schools provide a "free appropriate public education" (FAPE) to all disabled students. 20 U.S.C. § 1412(a)(1)(A); *Brett v. Goshen Cmty. Sch. Corp.*, 161 F. Supp. 2d 930, 944 (N.D. Ind. 2001). This duty has both a procedural and a substantive component. In considering whether a school has met the FAPE requirement with respect to a student, courts must determine whether: (1) the school complied with the IDEA's procedures; and (2) the "individualized education program" (IEP) provided for the student was reasonably calculated to enable the student to receive educational benefits. *N.T. v. District of Columbia,* 839 F. Supp. 2d 29, 33 (D.D.C. 2012); *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.,* 349 F.3d 1309, 1312 (11th Cir. 2003).[11]

Because HSE never classified Jamarcus as a student with disabilities or instituted an IEP for him, only the district's procedural duties under the IDEA are relevant here. Cases applying the IDEA make clear that not every procedural violation constitutes a violation of the state's duty to provide a FAPE to the student; a school only runs afoul of its statutory duty when the procedural inadequacies "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or . . . cause[] a deprivation of educational benefits." *S. M. v. Hawaii Dep't of Educ.*, 808 F. Supp. 2d 1269, 1276 (D. Haw. 2011) (citing *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001)). Ordinarily, reviewing courts grant some deference to the decisions of the school district regarding the appropriate education accommodation for each child, reasoning that schools themselves are better equipped to understand a child's particular needs. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 206 (1982). However, where, as here, the school provided no special education services, and the issue for the

---

[11] This test is derived from the statute's test for hearing officers within the administrative review process which, in most IDEA cases, precedes review by courts. 20 U.S.C. 1415(f)(3)(E)(ii).

court to decide is whether that decision was procedurally flawed or incorrect as a matter of statutory interpretation, no deference is necessary and *de novo* review is appropriate. *See Muller ex rel. Muller v. Comm. on Special Educ. of E. Islip Union Free Sch. Dist.,* 145 F.3d 95, 102 (2d Cir. 1998).

In her complaint, Plaintiff alleges that HSE violated the IDEA in two related ways: (1) by failing to *locate and identify* Jamarcus as a student in need of special education services after having knowledge of behavioral problems, suicide attempt, and other indications of vulnerability, and (2) by failing to *classify* him as suffering from emotional disturbance and thus eligible for services pursuant to the statute. Compl. ¶ 61(a), (b). Although her language did not precisely relate the allegations to recognized procedural violations, it points to two identifiable claims: that HSE violated the "child find" obligation, and that it failed its procedural duty to evaluate Jamarcus properly when it did consider his eligibility for special education.

### a. "Child Find"

The IDEA requires that each school "ha[ve] in effect policies and procedures" by which it will identify, locate, and evaluate "[a]ll children with disabilities residing in the State" to determine whether these children require special education and related services. 20 U.S.C. § 1412(a). This "child find" obligation covers all school children above the age of three, and extends "even to children who are suspected of being a child with a disability … even though they are advancing from grade to grade." 34 C.F.R. § 300.111(c)(1); *Sch. Bd. of the City of Norfolk v. Brown,* 769 F. Supp. 2d 928, 941 (E.D. Va. 2010). Where a child is suspected of being a child with a disability, the school should assess him or her "in *all* areas of suspected disability." 20 U.S.C. § 1414(b)(3)(B) (emphasis added); *Brown,* 769 F. Supp. 2d at 942. Although the obligation binds schools broadly, they are not "absolutely" liable for every failure to identify a

23

student who would have qualified for services. *See A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 225 (D. Conn. 2008); *J.S. v. Scarsdale Union Free Sch. Dist.,* 826 F. Supp. 2d 635, 660 (S.D.N.Y. 2011). Instead, the obligation is triggered only where the school authorities have reason to suspect the child may be disabled, *Brown,* 769 F. Supp. 2d at 942; the statute provides that authorities will be charged with such a basis of knowledge where: (1) the parent of the child has expressed specific concern in writing to a teacher or administrative authorities that the child is in need of services, (2) the parent has requested an evaluation be undertaken, or (3) the teacher of the child or other administrator has expressed concerns about the child's pattern of behavior directly to the special education director or someone with similar authority. 20 U.S.C. § 1415(k)(5)(B); *Brown,* 769 F. Supp. at 942.

The factual record before us does not support a finding that HSE violated the "child find" requirement. As Thomas Bell, the district's special education director, testified, Article 7 (the Indiana statutory implementation of the relevant IDEA requirements) does not mandate any particular procedures for carrying out the child find obligation and HSE has adopted no such written procedures; the district does, however, train its teachers to be aware of "performance indicators" indicating abnormality for grade level. Bell Dep. 32–38. Classroom disruptiveness was one of the factors for which teachers were trained to be aware, *see* Godbout Dep. 64–65, and Jamarcus was disciplined multiple times for disruptive behavior, *see* Defs.' Br. 5–7. Nonetheless, Plaintiff has not pointed to any instance where an HSE teacher formally expressed concern to the special education director or other administrative authorities. Moreover, Jamarcus's passable grade performance, Bell Dep. 129, 149–150, and lack of obvious physical or mental limitations make it at least plausible that none of his teachers would have concluded that his behavioral problems amounted to a disability. *Cf. E. J. ex rel. Tom J. v. San Carlos Elementary Sch. Dist.,*

24

803 F. Supp. 2d 1024, 1031 (N.D. Cal 2011) (district did not violate child find obligation where teachers had no reason to notice or report what turned out to be a disability). And although she faults Tige Butts and HSE for failing to inform her of her rights to make such a request, *see* N. Moore Aff. ¶¶ 9–14, it is undisputed that Plaintiff never requested an evaluation prior to the winter of Jamarcus's eighth grade year. When she did make the request, the district convened a Case Conference Committee and conducted an evaluation within the "reasonable time" deadline provided by the statute. 20 U.S.C. 1414(a)(1)(D)(i)(I), (II). As we have already noted, HSE's failure to make a serious assessment of the possibility that Jamarcus was emotionally disturbed before January 2010 might speak to negligence on the part of the district or its employees— particularly Tige Butts, who was the most knowledgeable about Bell's problems—but the evidence fails to show a violation of the district's specific procedural duty under the "child find" mandate.

### b. The Evaluation Process

Once a school does decide to evaluate a student for disability status, the IDEA imposes a number of procedural safeguards. When the Case Conference Committee (CCC) makes its evaluation decision, it is expected to draw upon data comprehensive enough to offer a true picture of the student's physical, emotional, and cognitive limitations. As to any testing procedures used, the statute and accompanying regulations require that: no single assessment tool or measure may be the sole criterion to determine whether a student has a disability or to determine the content of the student's educational program, 20 U.S.C. §§ 1412(b)(2)(A), (B); 34 C.F.R. §§ 300.304(b)(1)–(2), any tests be administered by trained personnel in conformance with the instructions provided by the tests' authors, 20 U.S.C. §§ 1412(b)(3)(A)(iv)–(v); 34 C.F.R. §§ 300.304(c)(1)(iv)–(v), and the methods used must be sufficiently comprehensive to evaluate all

of the student's special education needs, whether or not they are commonly linked to the disability category in which the student is classified. 34 C.F.R. § 300.304(c)(6). A child's treating physician or psychiatrist should have a role to play, and should be given an opportunity to provide professional input, though his or her opinion will not be dispositive. *See Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 640–641 (7th Cir. 2010) (noting that while a "physician's diagnosis and input" is important, a doctor cannot simply "prescribe" special education). Finally, the federal regulations require that the evaluation decision be informed by classroom observation, where student can be "observed in his or her learning environment, so the student's academic performance and behavior in areas of difficulty can be documented." 34 C.F.R. § 300.310(a).

In addition to the procedural requirements surrounding the evaluation itself, the IDEA mandates that parents be fully informed of their rights. After the evaluation is completed, the committee must make a written report of the results, which must be provided without cost to the parents. 34 C.F.R. § 300.306(a)(2). Whenever a school proposes to take any action related to the student's special education status (including initiating an evaluation), the parents have a right to receive a notice which explains the action proposed or refused, the reason for the decision, and the existence of IDEA procedural safeguards such as a due process hearing and judicial appeal. 20 U.S.C. § 1415(c)(1)(A)–(F). At certain times, including upon initial parental request for evaluation, the school must provide a second type of information—the "procedural safeguards notice." This notice must contain, among other things, statements of the need for parental consent to any special arrangements undertaken by the school, parents' rights to due process hearings, the availability of state-level administrative appeal, and the possibility of civil actions when administrative options are exhausted. 20 U.S.C. § 1415(d)(2).

Plaintiff finds fault with the ultimate decision reached by the CCC, and she challenges in detail two elements of the evaluation process as well. First, she alleges, and HSE does not appear to dispute, that the CCC failed to conduct in-classroom observations for use in the evaluation, in violation of federal regulations. Pl.'s Resp. 11, *see* 34 C.F.R. § 300.310(a). Dr. Mathers, the evaluator who would ordinarily be tasked with conducting that evaluation, acknowledges that testing Jamarcus one-on-one in a quiet room might well produce different impressions than observing him in a normal class setting. Mathers Dep. 48–50. Second, Plaintiff alleges that the district erred in relying on Bell's grade performance to conclude that he did not qualify as suffering from an emotional disturbance. Pl.'s Resp. 17 (citing Bell Dep. 129; HSE Dep. Ex. 3, at 207). In evaluating Jamarcus Bell, the CCC considered the possibility that he suffered from emotional disturbance or "other health impairments" (OHI) under the IDEA.[12] With regard to emotional disturbance, it found that Bell exhibited one of the five criteria—"inappropriate behavior under normal circumstances"—but nonetheless withheld disability status, pointing to his "average to above average" grades when considered over the span of the previous year and a half. Bell Dep. 129; HSE Dep. Ex. 3, at 207.[13] In doing so, the CCC relied on regulatory language stating that "emotional disability" will only exist where students display any one of the five criteria "over a long period of time and to a marked degree that adversely affects educational performance."[14] 34 C.F.R. 300.8(c)(4)(i); *see also* 511 I.A.C. 7-41-7 (parallel Indiana regulatory language). The district apparently reasoned that one quarter fell short of the "long period" of

---

[12] Moore does not appear to dispute the CCC's finding, or lack thereof, with respect to the catch-all OHI classification.

[13] Dr. Jennifer Horn, who performed a post-mortem examination of Jamarcus based on his files, testified in an affidavit that, in her opinion, he also suffered from depression, satisfying the "general pervasive mood of unhappiness" criterion for emotional disturbance. Horn Dep. 4, ¶ 16.

[14] The same five criteria listed by the IDEA itself.

time contemplated by the regulations: "I can't take a snapshot of even a nine-week quarter and base a decision on an emotional disability on just that." Bell Dep. 126–127.

We find this interpretation of the federal and state requirements to be inadequate, primarily for its impoverished conception of the proper baseline by which to measure Jamarcus Bell's "educational performance." Although it is no longer a fixed procedural requirement, the IDEA urges schools to take into account the discrepancy between a student's educational *potential* (as measured by aptitude tests or other means) and his or her actual performance, reasoning that a large enough performance gap is evidence of the effects of a disability. *See* 20 U.S.C. § 1414(b)(6)(A); 34 C.F.R. § 300.307(a)(1); *see also C.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 989–990 (8th Cir. 2011) (finding "adverse effects on educational performance" where, despite average aptitude, a student's reading performance lagged considerably below peers). Here, Jamarcus's aptitude was above the mean, *see* Mathers Dep. 12–15, and thus the "C" average he maintained might well be inapt as a baseline of acceptable performance. *Cf.* Bell Dep. 129. This is all the more true when there is evidence that, had there been continuous additional support, Jamarcus might have been able to curb some of the behavioral problems that could have been behind his performance deficit—as he was apparently able to do in the months immediately following his stay in Shelter Care. N. Moore Dep. 181; *Cf. Muller,* 145 F.3d at 103 (finding the positive effect of student's clinical counseling on school performance to be evidence that her emotional problems explained longstanding performance deficiencies). The school had ample evidence of Jamarcus's behavioral problems, and at least some basis for an inference that his emotional symptoms were dampening his classroom ability as well; on those grounds, their decision not to classify as disabled a student who admittedly otherwise qualified—solely on the basis of his supposedly satisfactory grades—seems unreasonable.

Natalie and Corey Moore have also stated that they received no information, either oral or written, regarding their rights in connection with the CCC evaluation; in her affidavit, Plaintiff asserts that she was left unaware of her ability to issue a complaint about the evaluation or initiate a due process hearing. N. Moore Aff. 103–105. HSE's case file on Jamarcus, however, shows that Plaintiff signed a "Notice of Case Conference Committee Meeting" that contained the following disclaimer: "I understand that a parent of a student with a disability has protection under the procedural safeguards which are provided with this notice and that I can request a copy of the procedural safeguards at any time." HSE Dep Ex. 3, at 9. The record contains a more detailed "Case Conference Committee Report," issued after the decision, which is addressed to Jamarcus's parents and includes a more specific statement of their appeal and due process rights. *Id.*, at 13–19. Since this document as it appears in the record is not signed by Plaintiff, we are unable to determine conclusively whether she received and reviewed it. Thus, while we cannot say whether Plaintiff was explicitly informed of her appeal rights as required under the IDEA, Plaintiff's contention that she was left *completely* in the dark is exaggerated at best and disingenuous at worst. Nonetheless, the record is insufficient for us to foreclose the possibility that, despite providing advance information of the existence of a procedural safeguards notice, the district failed to follow through and deliver it.

### c. Effect of the Procedural Inadequacies

We have thus concluded that HSE's conduct of the evaluation process was flawed, in that it wrongly relied solely on grades to counteract the evidence of Bell's disability status, failed to integrate classroom observation into the evaluation, and may have failed to give proper notice of their rights to Bell's family. In order for those procedural errors to give rise to liability for violating the statute (and thus negligence per se liability), they must at least allow a fact-finder to

make an inference that they "result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or . . . cause[] a deprivation of educational benefits." *S.M.*, 808 F. Supp. 2d at 1276. Since two of the psychiatric experts involved, and even special education director Thomas Bell, acknowledge that a change in structure would have been beneficial to Jamarcus, *see* Bell Dep. 148–149 ("I agree that he needs a structured environment"), we find that it would be abundantly reasonable to conclude that the CCC's failure to classify him as disabled deprived Jamarcus of an "educational opportunity." It is clearer still that any failure to deliver proper notice of their rights to Natalie and Corey Moore would deny them a "meaningful input" into the process. *See Honig v. Doe,* 484 U.S. 305, 311 (1988). Although failure to give notice to otherwise knowledgeable and participating parents may be harmless in some cases, *cf. S.M.,* 808 F. Supp. 2d at 1275–1277, the Moores here assert that they never understood the special education services or had any detailed knowledge of their right to appeal. *See* Pl.'s Resp. 17–18. Reading the facts in a light most favorable to Plaintiff, it is reasonable to conclude that the district effectively denied her any opportunity to register her displeasure or to seek reconsideration of the CCC's decision.

The Defendants reject the conclusion that violations of IDEA procedure, if they existed, caused any meaningful harm, pointing to the Moores' supposed opposition to any special education plan as evidence that even a perfectly conducted process would have produced the same result. Defs.' Br. 28. This objection is unavailing, for two related reasons. First, as we have already noted, the question of the Moores' opposition to special education is a disputed one. Plaintiff maintains that, whatever her reservations about special education were, she was frustrated at the CCC's decision that "nothing could be done"; moreover, she contends that her misgivings reflected her ignorance of the process—an ignorance fostered by the district's failure

30

to inform her properly. Pl.'s Resp. 18 (quoting N. Moore Dep. 103–104). Second, the district's obligation to provide a FAPE to a student is not excused by parental opposition to any particular plan. *See C.B. v. Special Sch. Dist. No. 1,* 641 F. Supp. 2d 850, 856 n. 3 (D. Minn. 2009), *rev'd on other grounds,* 636 F.3d 981 (8th Cir. 2011). While the IDEA does specify that parental consent is required for any initial evaluation and before a school puts any IEP into force, 20 U.S.C. §§ 1414(a)(1)(D)(i)(I)–(II), the school's obligation to provide services exists independently. HSE cannot defend its decision not to classify Jamarcus as disabled—or argue that its errors were harmless—by pointing to the opinions Plaintiff arguably expressed to the CCC.

Applying negligence per se principles, we therefore conclude that there is at least a genuine factual dispute as to whether HSE violated the IDEA, a statute that embraces Plaintiff within its protected class and that contemplates Jamarcus's suicide as a type harm the risk of which it seeks to prevent.

## C. Count Three – Negligence Per Se for Violation of the Rehabilitation Act

With regard to Plaintiff's second negligence per se claim arising under the Rehabilitation Act, our discussion can be briefer. Since the facts do not support a claim that HSE acted with the heightened mental state necessary to constitute a violation of the statute authorizing this type of action, we have no need to analyze the other requirements for negligence per se liability.

Title V of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*., serves as a complement to the IDEA and the Americans with Disabilities Act (ADA), prohibiting discrimination on the basis of disability in any public or private programs that receive federal financial assistance.  29 U.S.C. § 794. Its principal operative provision, Section 504, is frequently used by students or their parents alleging that public school systems failed to provide

31

necessary accommodations to their needs. *See, e.g., Brookhart v. Ill. State Bd. of Educ.*, 697 F.2d 179, 183–184 (7th Cir. 1983). To establish a claim under Section 504, the plaintiff must show that: "(1) he is disabled, (2) he is 'otherwise qualified' to participate in the program, and (3) he is being excluded because of his disability." *Sandlin v. Switzerland Cnty. Sch. Corp.*, 2009 WL 2563470, at *6 (S.D. Ind. Aug. 19, 2009) (citing *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 843, 845 n. 6 (7th Cir. 1999)).

As the Seventh Circuit has noted, the Rehabilitation Act is broader in its potential scope than the IDEA; it prohibits discrimination and failure to accommodate in any program a school otherwise makes available. *Timms ex rel. Timms v. Metro. Sch. Dist. of Wabash Cnty., Ind.*, 722 F.2d 1310, 1317 (7th Cir. 1983). This broader scope, however, is tempered by a narrower standard of liability. Courts in this Circuit will not award money damages in this type of Section 504 suit unless a school engaged in intentional discrimination or failed to provide a reasonable accommodation.[15] *Washington*, 181 F.3d at 847; *Beth B. v. Van Clay*, 211 F. Supp. 2d 1020, 1035 (N.D. Ill. 2001); *see also Jones v. Hous. Auth. of City of South Bend,* 915 N.E.2d 490, 494 (Ind. Ct. App. 2009). Section 504 suits are not the proper vehicle for imposing "educational malpractice" liability on schools, *Beth B.*, 211 F. Supp. 2d at 1035, and therefore this court has also held that "failure to accommodate" must constitute something more than mere negligence— a plaintiff must point to bad faith or gross misjudgment. *See Sandlin,* 2009 WL 2563470, at *8 (citing *Hoekstra ex rel. Hoekstra v. Indep. Sch. Dist. No. 283*, 103 F.3d 624, 626 (8th Cir. 1996)). As the Eighth Circuit explained, this more restricted liability standard achieves:

---

[15] There is a third, disparate-impact type basis of liability, where "the defendant's rule disproportionally impacts disabled people." *Washington,* 181 F.3d at 847. Since Moore challenges only a single adjudication rather than the application of any identifiable district rule, applying "disparate impact" liability here would be inappropriate.

> a proper balance between the rights of handicapped children, the responsibilities
> of state educational officials, and the competence of courts to make judgments in
> technical fields. So long as the state officials involved have exercised professional
> judgment in such a way as not to depart grossly from accepted standards among
> educational professionals, we cannot believe that Congress intended to create
> liability under § 504.

*Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982). Although a suit for prospective

relief under the statute could proceed under a more lenient standard of liability, *see Sandlin*,

2009 WL 2563470, at *9, a plaintiff seeking only damages after the fact must clear this

heightened bar.

Plaintiff has not shown that the district intentionally discriminated against Jamarcus.

Although she asserts that the district wanted his problems "out of sight, out of mind," none of the

facts on the record show that he was denied access to a school program *because of* his disability.

*Cf. Washington,* 181 F.3d at 847. Nor can the district's conduct during the evaluation process

reasonably be thought to reflect gross misjudgment or bad faith. The arguable failure to provide

notice, absent any indication that the school withheld information in order to thwart Plaintiff's

rights, fails to rise above ordinary negligence, especially since Plaintiff has provided us with no

evidence that the school's decision with regard to Bell's disability status was so baseless as to

constitute gross misjudgment or was otherwise pretextual or discriminatory. As we have

discussed, the CCC justified the decision on a colorable—if perhaps erroneous—interpretation of

federal regulations under the IDEA. HSE Dep. Ex. 3, at 13–19. Plaintiff brings this claim not

under Section 504 itself, but rather under a negligence per se theory. Just as we cannot stray from

Congress's evident intent as to the availability of compensatory damages under the

Rehabilitation Act, however, so we cannot countenance an alternate route to damage awards

exceeding congressional intent through a negligence cause of action. *See generally Cipollone v.*

*Liggett Group, Inc.*, 505 U.S. 504, 516 (1992). Although Jamarcus was within the protected class

envisioned by the statute, the type of claim brought by his mother is not. Therefore, her negligence per se claim under Section 504 must fail.

## D. Causation

Plaintiff has established a genuine factual dispute on her allegations that HSE breached its ordinary duty of care and its statutory duty under the IDEA. HSE can still obtain summary judgment as to these two surviving claims, however, if it can show that its breach was not the proximate cause of the injury as a matter of law. Defendants argue that they have met this burden because Jamarcus's suicide was an "intervening cause" under Indiana law. Defs.' Br. 32–35.

We have already stated, in denying Defendants' motion to dismiss this case, that suicide does not *inherently* break the chain of causation establishing liability in a wrongful death suit. Docket No. 60, at 10–15. Indiana does recognize the doctrine of intervening cause, and case law holds that "suicide constitutes an intervening cause, as a matter of law, if committed by one who is sane enough to realize the effect of his actions." *Hooks SuperX, Inc. v. McLaughlin*, 642 N.E.2d 514, 520 (Ind. 1994). If the decedent had "mind enough to know what he wanted to do, and how to do it," then his suicide breaks the causal chain, *Kimberlin v. DeLong,* 637 N.E.2d 121, 126 (Ind. 1994); on the other hand, the tortfeasor may still be liable where the death is "the result of an uncontrollable influence, or is accomplished in delirium or frenzy, caused by the defendant's negligent act or omission." *Id.* (citing *Brown v. American Steel & Wire Co.*, 88 N.E. 80, 84 (Ind. 1909)).

We also stated previously, and we now reassert, that the concept of foreseeability cannot be "summarily divorced" from the rule of thumb established in these cases. Docket No. 60, at 14. As the court explained in *Riesbeck Drug Co. v. Wray,* 39 N.E.2d 776 (Ind. Ct. App. 1942), *overruled on different grounds by Creasy v. Rusk*, 696 N.E.2d 442 (Ind. Ct. App. 1998), a fully

voluntary and willful act of suicide cuts off a defendant's negligence liability *because* such an act is deemed to be unforeseeable as a matter of law. 39 N.E.2d at 780. Foreseeability therefore remains in the background of our inquiry, in keeping with its traditional role as the touchstone of the proximate cause analysis. *See generally Control Techs., Inc. v. Johnson,* 762 N.E.2d 104 (Ind. 2002); Restatement (Second) of Torts § 442A. If a suicide is a characteristic and foreseeable outgrowth of the risk created by a defendant's conduct, it would be contrary to the core principles of Indiana tort law to allow a defendant to escape liability by pointing to that suicide as an intervening cause.

We find that Defendants have failed to meet their burden of showing that Jamarcus's suicide was a "voluntary, willful" act, unforeseeable as a matter of law. In denying Defendants' motion to dismiss on the question of intervening cause, we pointed to the following facts which, if established, could plausibly raise a question whether the suicide was wholly volitional: "admissions that he could not handle constant bullying … his tendency to 'act out' unpredictably and become 'infuriated,' the trifecta of mental disorders with which he was diagnosed, his propensity to cut himself and ingest dangerous amounts of pills, and a reputable psychologist's suspicion that he suffered from impulse control disorder." Docket No. 60, at 14. At this stage of the proceedings, we can say that Plaintiff has substantiated enough of these allegations to survive summary judgment.

The record does not show that Jamarcus was subjected to systematic bullying, but the evidence left by his suicide note supports the inference that an inability to cope with the school environment was a driving force behind the tragedy of his death. He wrote: "S[chool] is getting harder. I can get tests and class work done yeah that's ea[s]y. Mr. Wright is a douche … he just likes to give out detentions cause he is a douche. It's really hard to tell you why I am killing

myself but stuff has just built up to[o] much." Pl.'s Resp. 39 (citing Flynn Dep. 16. Ex. 2). Dr.

Christopher Sullivan, who examined Jamarcus before his death, diagnosed him with major

depressive disorder, oppositional defiant disorder, and impulse control disorder, as well as

features consistent with ADHD and borderline personality—a constellation of emotional

problems he described as a "lethal combination." Pl.'s Resp. 36. Dr. Sullivan further noted that

patients with such personality disorders can experience volatile, unpredictable mood swings,

which can be triggered by perceived criticism: "If they perceive themselves as being criticized or

not supported or abandoned in any way, then in the borderline personality that is very

emotionally upsetting and creates a lot of instability. And as that escalates, they are at risk for

acting in harmful ways to themselves." Sullivan Dep. 43–44. Jamarcus's statements betray the

same inability to control his own behavior. In an interview, he discussed his frustration at being

unable to "stay out of trouble"; in a seventh grade essay he admitted to cutting himself and

attempting to overdose, and he wrote: "I've done some terrible things to good people. I am a

manipulator, a li[a]r, and a criminal—only 13 years old…. I literally don't know what's wrong

with me…. When I do stuff, I don't think of the consequences I just do it." HSE Dep. Ex. 2, at

72–73.

      Jamarcus's disciplinary record amply reinforces the picture of a child with profound

difficulties in controlling his own actions, with 36 reported incidents in junior high school—at

least 19 of which involved inappropriate conduct towards other students. Defs.' Br. 6, ¶ 25; Pl.'s

Resp. 5 (citing HSE Dep. Ex. 2, at 9–10). The existence of a pattern of self-harm—including a

previous suicide attempt—rather than a single isolated incident comports with the notion that

Jamarcus was to some extent victimized by his impulses rather than fully the master of them. Dr.

Jennifer Horn, who performed a post-mortem examination, stated that in her opinion,

"Jamarcus's psychiatric conditions prevented him from overcoming the impulses of his depressed state and active suicidal ideation, and rendered him incapable of understanding and/or considering the consequences of suicide at the time he took his own life." Horn Dep. 7, ¶ 26.

In a suicide case, the decedent's mental health and state of mind at the time of death are factual questions, which "ordinarily must be decided by the jury and not by way of summary judgment motion." *Best Homes, Inc. v. Rainwater,* 714 N.E.2d 702, 707 (Ind. Ct. App. 1999). As we have already noted, *supra* § I(A), suicide is within the class of risks created by the school's allegedly negligent handling of Jamarcus Bell's case, and the high school special education director himself felt that his death might have been prevented had the district intervened more forcefully. Simmons Dep. 140–142.  Since we cannot summarily conclude that his act of suicide was willful and voluntary, then we cannot agree that it constituted an intervening cause relieving HSE of liability.

### E. Defendants' Affirmative Defenses

The Defendants present two further defenses to negligence liability under Counts One and Two: immunity and contributory negligence. We find the claim of immunity to be meritless, and we conclude that Defendants have failed to establish contributory negligence as a matter of law.

#### 1. Immunity

The Indiana Tort Claims Act (ITCA) provides that "a governmental entity or an employee acting within the scope of the employee's employment" is not liable on a tort claim under certain enumerated circumstances. Ind. Code § 34-13-3-3. This statute is a limited exception to the modern doctrine in Indiana law which has abolished governmental tort immunity, and is "construed narrowly and against the grant of immunity."  *Stillwater of Crown*

*Point Homeowners' Ass'n v. Kovich,* 865 F. Supp. 2d 922, 932 (N.D. Ind. 2011) (citing

*Hochstetler v. Elkhart Cnty. Highway Dep't*, 868 N.E.2d 425, 426 (Ind. 2007)). The existence of

immunity is a legal question, to be decided by the court. *Stillwater,* 865 F. Supp. 2d at 932.

Defendants argue that HSE is immune under the "enforcement" section of the ITCA,

which provides immunity for "the adoption and enforcement of or failure to adopt or enforce:

(A) a law (including rules and regulations); or (B) in the case of a public school or charter

school, a policy." Ind. Code § 34-13-3-3(8). As Plaintiff points out, this argument relies on a

misunderstanding of the meaning of the term "enforcement" as used by the statute. As the

Indiana Court of Appeals explained in *St. Joseph County Police Department v. Shumaker,* 812

N.E.2d 1143 (Ind. Ct. App. 2004), enforcement means "compelling or attempting to compel the

obedience of *another* to laws, rules, or regulations, and the sanctioning or attempt to sanction a

violation thereof." 812 N.E.2d at 1150 (emphasis in original). Thus, a school district would be

justified in claiming immunity under the ITCA for its decisions to suspend, expel, or otherwise

impose discipline on students. *See King,* 790 N.E.2d at 483. A school may *not* claim immunity,

however, when sued regarding its compliance, or failure to comply, with laws and regulations.

*St. Joseph,* 812 N.E.2d at 1150. Plaintiff's claims under the common law and the IDEA allege

not that HSE harmed Jamarcus Bell by enforcing laws against him, but rather that it failed to

comply with laws that bound *the district* to observe a standard of care for his safety and well-

being. *See* Pl.'s Resp. 33. As such, "enforcement" immunity does not protect HSE's actions.

**2. Contributory Negligence**

As the Defendants have correctly noted, Indiana's modern embrace of comparative

negligence principles does not apply in suits against local government entities, where

contributory negligence can still serve as an absolute bar against liability. *See* Ind. Code 34-51-2-

2 (exempting "government entities or public employees" from the Comparative Negligence Act); *see also Funston v. Sch. Town of Munster,* 849 N.E.2d 595, 598 (Ind. 2006) (school district can raise contributory negligence defense). Contributory negligence exists where "the plaintiff fails to exercise a degree of care and caution that an ordinary, reasonable, and prudent person would exercise." *Yates v. Johnson Cnty. Bd. of Comm'rs,* 888 N.E.2d 842, 852 (Ind. Ct. App. 2008). Contributory negligence is a question of fact, and summary judgment is not appropriate unless "the facts are undisputed and only a single inference can be drawn therefrom." *Id.* (quoting *Funston,* 849 N.E.2d at 598).

   Our decision on the issue of contributory negligence flows naturally from our resolution of the underlying negligence cause of action. Defendants argue that if there was negligence in the CCC's evaluation of Jamarcus, then his parents share the responsibility because of their opposition to the idea of special education and their failure to object to the classification decision. As we have noted, however, Natalie and Corey Moores' attitude towards the district's special education evaluation remains in dispute. C*f. Yates,* 888 N.E.2d at 852 (existence of an affidavit by the plaintiff creating a factual dispute is sufficient to defeat summary judgment on contributory negligence). If read most favorably to Plaintiff, the record shows that Plaintiff's acquiescence—if indeed she did acquiesce in the decision at all—was rooted in her reliance on the professional expertise of the CCC members. Pl.'s Resp. 30–31. Moreover, to the extent the Moores did reasonably rely on the expert opinions of others and failed to complain or appeal the final decision because they lacked the requisite detailed notice of their right to do so, it would be inaccurate to describe their conduct as "negligent." Plaintiff rightly refers to the notion that a person generally "does not have a duty to anticipate the negligence of another." *Hopper v. Carey,* 716 N.E.2d 566, 573 (Ind. Ct. App. 1999). In order to establish contributory negligence here as a

matter of law, Defendants would have to show that the Moores indisputably agreed to the

district's decisions—and that they did so independently, free of any reliance or ignorance the

district had a hand in creating. They cannot do so on the facts before us.

## II.     Count Four -- Section 1983 Claims

Count Four of Plaintiff's complaint states a claim under 42 U.S.C. § 1983. Section 1983,

of course, is a procedural vehicle for the vindication of federally-protected rights rather than a

substantive grant of rights, *see Albright v. Oliver,* 510 U.S. 266, 271 (1994), and the complaint is

hardly clear in stating which rights serve as the predicate of the claim. Although Count Four is

headed "Deprivation of Constitutional Rights," there appear to be both statutory and

constitutional elements. First, Plaintiff alleges first that Defendants violated Jamarcus's right to a

"free appropriate public education secured by federal law"; we will construe this as a claim

based on the IDEA, as both parties' briefing seems to proceed on this assumption. *See* Compl. ¶

61. The second component, which has been subject to more extensive briefing by both sides, is

based on deprivation of Fourteenth Amendment due process and equal protection rights. Compl.

¶ 62 (a)–(f).

On Count Four, Plaintiff names two individual defendants as well as HSE. As to

individual defendant Dr. Brian Smith, superintendent of the Hamilton Southeastern School

District, Plaintiff has failed to develop any facts showing his personal involvement in this matter,

and has not advanced any argument for his liability in its briefing. *See* Defs.' Rep. 14. Since

Plaintiff has apparently abandoned the claim against Dr. Smith, we accordingly grant

Defendants' motion for summary judgment as to all Section 1983 claims against him.[16]

---

[16] It is possible that, although she failed to say so, Plaintiff intended to sue Dr. Smith in his official capacity as
superintendent. If he were sued in his official capacity, Plaintiff would not need to make a showing of any individual
liability, but the suit against him would rather be a proxy for a suit against the district. However, since suit against
municipal entities themselves under Section 1983 is allowed, *see Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690

With respect to the remaining defendants HSE and Tige Butts, we will examine the statutory and constitutional Section 1983 claims in turn.

## A. Claims Based on Violation of the IDEA[17]

The United States Supreme Court recognizes a rebuttable presumption that a statutory right is enforceable by a member of the statute's intended beneficiary class. *City of Rancho Palos Verdes, Cal. v. Abrams,* 544 U.S. 113, 120 (2005); *Blessing v. Freestone,* 520 U.S. 329, 341 (1997). This presumption can be rebutted by demonstrating that Congress did not intend Section 1983 to apply when creating the right in question. *Blessing,* 520 U.S. at 341. The circuit courts are divided on whether a Section 1983 claim is available for a violation of the IDEA, *see* 27 Causes of Action 2d 447 (2013) (collecting cases), but the Seventh Circuit is among the minority concluding that such suits are permissible. *See Marie O. v. Edgar,* 131 F.3d 610, 621–622 (7th Cir. 1997); *McCormick v. Waukegan Sch. Dist. No. 60*, 374 F.3d 564, 569 (7th Cir. 2004).[18]

### 1. Against Tige Butts

Although Section 1983 contemplates suits against individuals for their violations of federal statutory rights, individuals are not proper defendants under the IDEA itself. *See P.N. v. Greco,* 282 F. Supp. 2d 221, 238 (D.N.J. 2003).[19] The commands and funding conditions of the

---

(1978)—and Plaintiff has in fact sued HSE on the same theory of liability—the claim against Dr. Smith is redundant and can be cast aside. *See, e.g.*, *Cotton v. District of Columbia*, 421 F. Supp. 2d 83, 86 (D.D.C. 2006); *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003).

[17] The complaint can also be read to state a claim under Section 1983 for violation of Section 504 of the Rehabilitation Act, and Plaintiff refers to that possibility in her Response brief. Since we did not find that any Defendant has violated the Rehabilitation Act, however, we need not consider a Section 1983 claim based on that statute.

[18] At least one circuit that has examined the issue in light of the Supreme Court's 2005 decision in *Rancho Palos Verdes*—which emphasized the importance of narrowly construing the use of § 1983 for statutory violations—has changed its stance and found § 1983 unavailable for IDEA and § 504 violations. *See A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007). The Seventh Circuit has not reexamined *McCormick* since *Rancho Palos Verdes,* however, and in light of the fact that *McCormick*'s reasoning is by no means necessarily invalidated by the Supreme Court's intervening decision, we will continue to follow *McCormick*.

[19] We are aware of a number of cases, including *Colon ex rel. Disen-Colon v. Colonial Intermediate Unit 20*, 443 F. Supp. 659, 669 (M.D. Penn. 2006), and *P.N. v. Greco*, 282 F. Supp. 2d 221 (D.N.J. 2003), that cite the Third Circuit case of *W.B. v. Matula*, 67 F.3d 484 (3d Cir. 1995) for the proposition that an individual can be liable for IDEA

IDEA—including the central FAPE requirement—are directed at states and "local educational agencies," as defined by statute . *See* 20 U.S.C. § 1401(19) (defining "local educational agency"); *see generally* 20 U.S.C. § 1412 (outlining procedural requirements imposed on states and their subdivisions). In determining whether a federal right furnishes a cause of action under Section 1983, the "crucial consideration is what Congress intended." *Smith v. Robinson,* 468 U.S. 992, 1012 (1984). Although the IDEA's saving clause, 20 U.S.C. § 1415(l), may indicate intent to preserve alternate vehicles for recovery, including Section 1983, extending liability to a broad new swath of individual actors would contravene the express limitations of the statutory structure Congress created. *See Rancho Palos Verdes,* 544 U.S. at 120 ("evidence of congressional intent may be found directly in the statute creating the right"). Defendants' motion for summary judgment with respect to the Section 1983 liability of Tige Butts for violation of the IDEA is therefore granted.

### 2. Against HSE

Because we have denied summary judgment on Plaintiff's negligence per se claim based on HSE's alleged violation of the IDEA, we also deny summary judgment as to the Section 1983 claim against HSE based on the same substantive allegation.

### B. Constitutional Claims

While Plaintiff's complaint made general reference to violations of the Fourteenth Amendment due process and equal protection clauses, her more specific allegations describe a substantive due process claim against HSE and Butts, and the parties have not introduced arguments on other constitutional grounds. *See* Compl. ¶ 62(a)–(f). HSE, like Butts, is subject to

---

violations under Section 1983 even though IDEA individual liability is not available. We do not read *Matula* (which has been superseded by the Third Circuit's rejection of *all* 1983 suits based on the IDEA) as squarely establishing that proposition, and we find no other case law purporting to use Section 1983 to collect damages against individuals in their personal capacity for violating the IDEA.

suit under a Section 1983 constitutional claim, but only for its own liability. *Respondeat superior* is not cognizable in Section 1983 municipal liability suits. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

### 1. Against Tige Butts

In challenges to an executive or administrative action under substantive due process, plaintiffs face an extraordinarily high burden; they must show that an actor's conduct under color of law was so egregious as to shock the judicial conscience. *See City of Sacramento v. Lewis,* 523 U.S. 833, 846–847 (1998). The Supreme Court's foundational case on the issue, *Rochin v. California,* 342 U.S. 165 (1952), still serves as a benchmark for the kind of outrageous conduct necessary to trigger the freestanding protections of the due process clause when a violation of no specific constitutional or statutory right is alleged. There, police officers forcibly pumped a criminal suspect's stomach to gather evidence—"a course of conduct bound to offend even hardened sensibilities." *Rochin,* 342 U.S. at 171–172. The Court has held that, as a matter of law, negligence cannot meet this high standard. *See Lewis,* 523 U.S. at 848. "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability." *Daniels v. Williams,* 474 U.S. 327, 332 (1986).

Here, we can say as a matter of law that summary judgment is appropriate, because Butts's conduct was not sufficiently culpable to trigger due process liability. With respect to Tige Butts, Plaintiff bases her claim on the following alleged instances of misconduct: Butts's failure to refer Jamarcus to counseling after his numerous disciplinary violations, his reliance on progressive discipline rather than the "other options" inquired about by Plaintiff, his failure to follow up with Jamarcus when he returned from hospitalization after his suicide attempt, and his

43

allegedly incomplete representation of the extenuating circumstances when making his presentation on Jamarcus's disciplinary problems to the CCC. Pl.'s Resp. 46–47. Even if true, this conduct hardly rises to the level of the conscience-shocking. Even what Plaintiff characterizes as the most "egregious" instance of misbehavior, *id.*—Butts's failure to take affirmative steps after Jamarcus's suicide attempt—falls within the realm of negligence rather than intentional, outrageous wrongdoing.  Butts himself justifies his inaction on the grounds that it was "not my place" to intrude into parental privacy, Butts Dep. 165–166, and nowhere does Plaintiff allege in other than conclusory terms that Butts intended to cause harm to Jamarcus. *Cf.* Pl.'s Resp. 48 ("Mr. Butts intentionally led Natalie and Corey to believe that Jamarcus was a bad kid.")

Precedent establishes that even *gross* negligence by a school official towards a student is insufficient to create substantive due process liability. *See Archie v. City of Racine,* 847 F.2d 1211, 1219 (7th Cir. 1988). "The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators . . . Section 1983 was not intended to be a vehicle for federal-court corrections of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland,* 420 U.S. 308, 326 (1975). Even where officials' conduct was "abhorrent" or their exercise of judgment "questionable," the Seventh Circuit has consistently found that professional failure does not suffice for a due process claim. *See Tun v. Whitticker,* 398 F.3d 899, 903, 904 (7th Cir. 2005) (affirming summary judgment against constitutional claim even though school officials clearly erred in expelling students for locker-room horseplay); *Dunn v. Fairfield Cmty. High Sch., Dist. No. 225*, 158 F.3d 962, 966 (7th Cir. 1998) (affirming summary judgment for school where decision to assign failing grades to students, though unreasonable, was

"nowhere close to a constitutional violation"). Measured by this standard, Butts's conduct, no matter how potentially blameworthy or even tortious, does not suffice to support a reasonable inference of a due process violation.

### 2. Against HSE

In considering a Section 1983 constitutional claim for municipal liability, a court must consider two questions: (1) whether a constitutional violation has occurred, and (2) if so, whether the municipality (rather than an individual actor) is responsible for that violation. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). We need address only the first question, because we find that Plaintiff has suffered no constitutional harm at the hands of HSE.

The individual charges in Plaintiff's complaint, taken together, amount to an allegation of culpable inaction on HSE's part.[20] *See* Compl. ¶ 62 ("failing to protect," "failing to provide adequate supervision," "failing to properly respond," etc.). The Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), establishes the general rule that on constitutional claims, municipal entities are not liable for "private violence" harms allegedly arising from their inaction or failure to protect. 489 U.S. at 197. It is well-established that public schools are encompassed within this principle—unlike prisons or state mental institutions, they do not have "custody" of children to the extent necessary to give rise to a constitutional affirmative duty to protect. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655 (1995); *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990)

---

[20] One of the complaint items, "failing to properly develop appropriate policies and failing to properly train its employees," Compl. ¶ 62(e), would present a viable legal issue only if an individual employed by HSE had violated Plaintiff's constitutional rights. Since we have found that neither Tige Butts nor any other individual HSE staffer was responsible for a due process violation, we cannot entertain the possibility that HSE is liable on a "failure to train" or "municipal policy" theory. *See Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998) ("A failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim").

(stating that "the government, acting through local school administrators, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises").

Plaintiff argues that the district can be held liable for a due process violation under a "state-created danger" theory, which is an exception to the general *DeShaney* principle. Under certain limited circumstances, a municipality can be liable for a constitutional violation, notwithstanding the absence of general affirmative duty, because its actions made the victim more vulnerable to danger than he or she would have been otherwise. *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 708 (7th Cir. 2002). A claim against HSE under this "state-created danger" theory must establish that: (1) the district, by its affirmative acts, created or increased a danger; (2) the district's failure to protect from the danger was the proximate cause of injury; and (3) the district's failure to protect her "shocks the conscience." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011).

As with Butts, the claim against HSE fails as a matter of law because the evidence forecloses a conclusion that the district's actions were "outrageous, uncivilized, and intolerable" to the extent necessary to satisfy this third prong. *See Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir. 1999). We are aware of only one case in which a court found a school had transgressed constitutional norms by fostering the risk of a suicide's suicide. In *Armijo ex rel. Chavez v. Wagon Mound Public Schools,* 159 F.3d 1253 (10th Cir. 1998), a school principal suspended a special education student for threatening violence against a teacher. 159 F.3d at 1256–1257. Despite knowing of the student's propensity for violence and history of discussing suicide, the principal ordered that the student be driven home and left home alone without notifying his parents; the student committed suicide almost immediately thereafter. *Id* at 1257. The Tenth Circuit found that leaving an unstable, violent student at home alone—and making no effort to

46

ensure that he had any parental or other supervision—was outrageous enough to shock the conscience and violate due process. *Id.* at 1262–1264. The facts before us show that HSE's culpability was far less extreme. The district did not "cut off private sources of aid" in expelling Jamarcus and denying him special education status. *Cf. Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 569 (11th Cir. 1997) (no constitutional liability based on suicide victim's mother's reliance on the school's suicide-prevention program). In fact, school officials maintained continuous communications with the Moores (even if these were arguably procedurally inadequate under the IDEA), and the school never knowingly placed him in a situation of physical danger. *Cf. Martin,* 295 F.3d at 711 (no constitutional violation for a suspended student's suicide when the child was released into her parents' custody as in a normal school day).

In rejecting a due process claim against a school district for a student's suicide, the First Circuit cautioned against conflating the ordinary standard of tort liability with the much higher threshold required to establish a due process violation. "Possibly there was school negligence here—one would need more information to make a judgment—but negligence is not a due process violation." *Hasenfus,* 175 F.3d at 73. HSE's actions towards Jamarcus—particularly its failure to classify him as emotionally disabled and provide services under the IDEA—may well have been unreasonable and negligent, even grossly so. HSE may thereby have increased Jamarcus's danger of self-harm, a risk that was reasonably foreseeable. The district did not, however, flagrantly mistreat him in a manner that shocks the conscience, and therefore any constitutional claims against it must fail.

## III.   Conclusion

Plaintiff has succeeded in establishing sufficient factual support for a reasonable inference that HSE was negligent in dealing with Jamarcus during his years in the school system,

and also that the district violated the procedural requirements of the IDEA. She has not, however, unearthed facts consistent with a higher level of culpability on the part of HSE, Brian Smith, or Tige Butts. Accordingly, we rule as follows on Defendants' Motion for Summary Judgment:

(1) Count One: wrongful death under state-law negligence – the motion is DENIED.

(2) Count Two: negligence per se for violation of the IDEA – the motion is DENIED.

(3) Count Three: negligence per se for violation of the Rehabilitation Act – the motion is GRANTED.

(4) Count Four: recovery under 42 U.S.C. § 1983 for violation of the IDEA – the motion is DENIED as to Defendant HSE, and GRANTED as to defendants Tige Butts and Brian Smith.

(5) Count Four: recovery under 42 U.S.C. § 1983 for violation of the Rehabilitation Act – the motion is GRANTED as to all Defendants.

(6) Count Four: recovery under 42 U.S.C. § 1983 for violation of the Due Process Clause of the Fourteenth Amendment – the motion is GRANTED as to all Defendants.

(7) Count Five: violation of Title IX of the Education Amendments of 1972 – the motion is GRANTED.

IT IS SO ORDERED.

Date: _____08/29/2013_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Daniel J. Gibson
DELK MCNALLY
gibson@delkmcnally.com

Jason R. Delk
DELK MCNALLY
delk@delkmcnally.com

Michael T. McNally
DELK MCNALLY
mcnally@delkmcnally.com

John W. Mervilde
MEILS THOMPSON DIETZ & BERISH
jmervilde@meilsattorney.com

Rick D. Meils
MEILS THOMPSON DIETZ & BERISH
rmeils@meilsattorney.com